IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| DEBORAH BLAIR | § | |
| v. | § | CIVIL ACTION NO. 6:13CV345 |
| COMMISSIONER, SOCIAL SECURITY ADMINISTRATION | § | |

**MEMORANDUM OPINION AND ORDER**

On April 19, 2013, Plaintiff initiated this civil action pursuant to the Social Security Act (The Act), Section 205(g) for judicial review of the Commissioner's denial of Plaintiff's application for Social Security benefits. Pursuant to 28 U.S.C. § 636(c), and the consent of both parties, the case was assigned to the undersigned for disposition.

I. **HISTORY**

On February 25, 2009, Plaintiff filed for disability insurance benefits under Title XVI of the Social Security Act (the Act). *See* Transcript ("Tr.") at 11, 208, 260. In her application, Plaintiff alleged disability beginning January 7, 2008. *Id.* The agency denied Plaintiff's application at the initial and reconsideration levels. *See* Tr. at 112-121. At Plaintiff's request, an ALJ held a hearing on April 22, 2009, and issued an unfavorable decision on July 23, 2010. *See* Tr. at 11-12, 89-104. Plaintiff appealed the ALJ's decision and, on February 12, 2012, the Appeals Council remanded the case back to the ALJ for further proceedings. *See* Tr. at 105-108.

On August 28, 2012, the ALJ held a supplemental hearing, at which Plaintiff, represented by an attorney, and a vocational expert (VE) appeared and testified. *See* Tr. at 42-64. Plaintiff was 53 years old on her alleged disability onset date and 58 years old on the date of the Commissioner's final

decision. *See* Tr. at 34, 208. Plaintiff has a high school education and past relevant work (PRW) as an office manager and receptionist. *See* Tr. at 33, 59, 262.

On September 12, 2012, the ALJ issued a twenty-five page decision denying Plaintiff's application for benefits. *See* Tr. at 11-36. The Appeals Council subsequently denied Plaintiff's request for review. *See* Tr. at 1. Therefore, the ALJ's decision became the Commissioner's final decision. *See Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Having exhausted her administrative remedies, Plaintiff filed the above-captioned case seeking judicial review of the Commissioner's decision under 42 U.S.C. § 405(g).

## II.    STANDARD

Title II of the Act provides for disability insurance for workers who are disabled. Judicial review of the denial of disability benefits under section 205(g) of the Act, 42, U.S.C. § 405(g), is limited to "determining whether the decision is supported by substantial evidence in the record and whether the proper legal standards were used in evaluating the evidence." *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991) (per curiam). A finding of no substantial evidence is appropriate only where there is a conspicuous absence of credible choices or no contrary medical evidence. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988); *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). Accordingly, the Court "may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute [the Court's] judgment for the [Commissioner]'s, even if the evidence preponderates against the [Commissioner]'s decision." *Bowling*, 36 F.3d at 435; *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988); *see Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993); *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992); *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Rather, conflicts in the evidence are for the Commissioner to decide. *Spellman*, 1 F.3d 357, 360 (5th Cir. 1993); *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990); *Anthony*, 954 F.2d 289, 295 (5th Cir. 1992); *Patton v.*

*Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983). A decision on the ultimate issue of whether a claimant is disabled, as defined in the Act, rests with the Commissioner. *Newton v. Apfel*, 209 F.3d 448, 455-56 (5th Cir. 2000); Social Security Ruling ("SSR") 96-5p.

"Substantial evidence is more than a scintilla but less than a preponderance – that is, enough that a reasonable mind would judge it sufficient to support the decision." *Pena v. Astrue*, 271 Fed.Appx. 382, 383 (5th Cir.2003); *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir.1994). Substantial evidence includes four factors: (1) objective medical facts or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability; and (4) the plaintiff's age, education, and work history. *Fraga v. Bowen*, 810 F.2d 1296, 1302 n.4 (5th Cir. 1987). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Court must do more than "rubber stamp" the ALJ's decision; the Court must "scrutinize the record and take into account whatever fairly detracts from the substantiality of evidence supporting the [Commissioner]'s findings." *Cook*, 750 F.2d 391, 393 (5th Cir. 1985). The Court may remand for additional evidence if substantial evidence is lacking or "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42. U.S.C. § 405(g) (2000); *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994).

A claimant for disability has the burden of proving a disability. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" is an anatomical, physiological, or psychological abnormality which is demonstrable by acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

In order to determine whether a claimant is disabled, the Commissioner must utilize a five-step, sequential process. *Villa*, 895 F.2d at 1022. A finding of "disabled" or "not disabled" at any step of the sequential process ends the inquiry. *Id.*; *see Bowling*, 36 F.3d at 435; *see* also *Harrel*, 862 F.2d at 475. Under the five-step sequential analysis, the Commissioner must determine at Step One whether the claimant is currently engaged in substantial gainful activity. At Step Two, the Commissioner must determine whether one or more of the claimant's impairments are severe. At Step Three, the Commissioner must determine whether the claimant has an impairment or combination of impairments that meet or equal one of the listings in Appendix I.

Prior to moving to Step Four, the Commissioner must determine the claimant's Residual Functional Capacity ("RFC"), or the most that the claimant can do given his impairments, both severe and non-severe. Then, at Step Four, the Commissioner must determine whether the claimant is capable of performing his past relevant work. Finally, at Step Five, the Commissioner must determine whether the claimant can perform other work available in the local or national economy. 20 C.F.R. §§ 404.1520(b)-(f), 416.920(b)-(f).

An affirmative answer at Step One or a negative answer at Steps Two, Four, or Five results in a finding of "not disabled." *See Villa*, 895 F.2d at 1022. An affirmative answer at Step Three, or an affirmative answer at Steps Four and Five, creates a presumption of disability. *Id.* To obtain Title II disability benefits, Plaintiff must show that he was disabled on or before the last day of his insured status. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir.1981), *cert. denied*, 455 U.S. 912 (1982). The burden of proof is on the claimant for the first four steps, but shifts to the Commissioner at Step Five if the claimant shows that he cannot perform his past relevant work. *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989) (per curiam).

### III.   ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ made the following findings in the September 12, 2012, decision:

The claimant meets the insured status requirement of the Social Security Act on January 7, 2008, her alleged disability onset date, and she will continue to meet them at least through December 31, 2012.

The claimant has not engaged in substantial gainful activity since January 7, 2008, her alleged disability onset date (20 C.F.R. § 404.1571 *et seq.*).

The claimant has the following severe impairments: degenerative joint disease of the knees, degenerative disc disease of the lumbar spine with back pain, hypertension, obesity, total deafness in one ear, a major depressive disorder (also characterized as a bipolar disorder and dysthymic disorder, and an anxiety disorder (also characterized as a panic disorder, post traumatic stress disorder, and attention deficit hyperactivity disorder (20 C.F.R. § 404.1520[c]).

The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

The residual functional capacity produced by the medically determinable impairments permits the claimant to frequently lift and/or carry less than 10 pounds and occasionally up to 10 pounds; sit 6 hours in an 8-hour workday; and stand and/or walk 2 hours in an 8-hour workday. The claimant should avoid climbing; using ladders, ropes, and scaffolds; climbing; squatting; kneeling; crawling; and vibration. The claimant can occasionally balance, stoop, bend, and crouch. She requires the ability to alternate sitting and standing every 30 to 45 minutes including the ability to stand and stretch. She should avoid hazards and dangerous moving machinery. She is restricted to hearing in a quiet office only environment. She is unable to understand, remember, and carry out complex instructions and unable to tolerate contact with the public. She retains the ability to understand, remember, and carry out detailed instructions. She is unable to tolerate more than occasional co-worker and supervisory interaction. She can perform no forced pace or assembly line tasks.

The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

Considering the claimant's age, education, work experience, and residual functional capacity, the claimant had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy (20 C.F.R. § 404.1569, § 404.1569(a), and § 404.1568[d]).

The claimant has not been under a disability, as defined in the Social Security Act, at any time from January 7, 2008, her alleged disability onset date, through the date of this decision (20 CFR § 404. 1520[g]).

*See* Tr. at 8-36.

The ALJ determined that Plaintiff was not disabled under section 1614 (a)(3)A) of the Social Security Act. *See* Tr. at 36.

## IV.    DISCUSSION AND ANALYSIS

Plaintiff asserts she cannot work due to degenerative disc disease of the lumbar spine, degenerative joint disease of both knees, carpal tunnel syndrome, obesity, total deafness in the left ear, hypertension, major depressive disorder, and anxiety disorder. *See* Tr. at 11, 208, 260. Plaintiff did not finish high school, but did obtain a GED. *See* Tr. at 45. She is a widow. *See* Tr. at 48.

Plaintiff presents the following specific issues: (1) Whether the Administrative Law Judge (ALJ) properly considered, at step five, whether Plaintiff could perform other work, with little, if any, vocational adjustment; (2) Whether the ALJ properly found that Plaintiff could perform the jobs that the vocational expert identified; (3) Whether the ALJ complied with the Appeals Council's Remand Order; and (4) Whether the ALJ considered all of Plaintiff's severe impairments. *See* Plaintiff's Brief ("Pl. Br.") at 1, 12-23.

## A.    The Medical Evidence in the Record.

The records before the ALJ reveal Plaintiff presented to Dr. Christopher Hughes, M.D. on December 4, 2007 to establish care. *See* Tr at 423. Plaintiff complained of anxiety, depression, excessive crying, concentration difficulties, short term memory difficulties, pain radiating down the right thigh and leg in a radicular fashion, chest pain and hearing loss in the left ear. *Id*. The physical exam revealed: her height was 65 inches; her weight was 209 pounds; her blood pressure was 120/78; there was no hearing in the left ear and decreased hearing in the right ear; the straight leg raising test ("SLR") was positive on the right; there was 1+ bilateral lower extremity edema; and she was anxious and easily distracted. *See* Tr. at 424-6.

Dr. Hughes' impressions included chest pain likely due to anxiety and depression, anxiety, depression, hyperlipidemia, allergic rhinitis, irritable bowel syndrome ("IBS"), hemorrhoids, hypertension ("HTN") and acoutstic neuroma. *See* Tr. at428-9. A stress test and echocardiogram was performed on December 12, 2007. The testing was fairly unremarkable except for some inducible LV ischemia due to ST changes. *See* Tr. at 354-5.

Plaintiff returned to Dr. Hughes on March 3, 2008. She reported worsening depression on Cymbalta, chronic back pain radiating down the right leg and chronic abdominal cramps. *See* Tr. at 415. The physical exam showed her weight had increased to 213 pounds, she had a positive SLR on the right and had 1+ bilateral lower extremity edema. *See* Tr. at 416-7. The impressions contained lumbar spine osteoarthritis, acoustic neuroma, IBS, allergic rhinitis, GERD, depression, hyperlipidemia, HTN and left breast mass. *See* Tr. at 418. An MRI of the brain was performed on March 12, 2008. It showed postoperative changes consistent with resection of acoustic neuroma without evidence of a recurrent tumor. *See* Tr. at 436.

Plaintiff saw Dr. Greg D'Angelo, Ph.D. for a Social Security scheduled consultative examination on April 2, 2008. She reported a longstanding history of depression beginning in the 1980's. *See* Tr. at 357. She also noted a suicide attempt in the 1980's. *Id*. Plaintiff reported current symptoms of becoming overly emotional when she tried to work, hearing loss, impaired memory for procedures at work, occasional problems finding words, difficulty comprehending what she read, poor penmanship, difficulty with multiplication and division, decision making problems, low energy, constantly wanting to sleep and concentration problems. *See* Tr. at 359. WAIS-III testing revealed her verbal IQ was 86, her performance IQ was 92 and her full scale IQ was 88. *See* Tr. at 359. WRAT-3 testing showed her grade equivalency in reading was 12.8, her spelling was 9.6 and her arithmetic was 5.4. *See* Tr. at 360. On the MMPI-2, her results were consistent with longstanding depression, low self esteem, high levels of self doubt and inadequacy, feelings of anxiety and a strong emotional response to stress. *See* Tr. at 360. The axis I diagnosis was dysthymic disorder-late onset. *See* Tr. at 362.

On April 3, 2008, Plaintiff had a follow up appointment with Dr. Hughes. Dr. Hughes reviewed the MRI of the brain and noted that she would be set up for a hearing aid. *See* Tr. at 408. Plaintiff saw Dr. Farrah Siddiqui, M.D. on May 6, 2008. An Audiogram showed mild to moderate downsloping sensorineural hearing loss in the right ear and profound hearing loss in the left ear. *See* Tr. at 366. Dr. Siddiqui's assessment was recent sensorineural hearing loss in the right ear and profound hearing loss in the left ear after acoustic neuroma surgery. *Id*. Dr. Siddiqui referred Plaintiff to Dr. Fred Owens of the Owens Ear Center. Id. Plaintiff presented to Dr. Fred Owens on June 5, 2008. She complained of gradual hearing loss in the right ear for the last 4 years and a history of left acoustic neuroma. *See* Tr. at 373. She also reported tinnitus, right greater than left, and vertigo. *Id*. Dr. Owens' impression was sensorineural hearing loss ("SHL") and hearing aids were recommended. *Id*.

On August 4, 2008, Plaintiff returned to Dr. Christopher Hughes. She said she was still having anxiety and especially when stressed. *See* Tr. at 400. The impressions were HTN, hyperlipidemia, depression, insomnia, anxiety, acoustic neuroma, allergic rhinitis and GERD. *See* Tr. at 402-3. Next, Plaintiff saw Dr. Hughes on January 13, 2009. She reported the Ambien was less effective for her insomnia and her depression was still present. *See* Tr. at 390. The physical examination was benign and the impressions were relatively unchanged. *See* Tr. at 391-3.

Plaintiff began psychiatric treatment with Dr. Frank Minirth at the Minirth Clinic on July 1, 2009. *See* Tr. at 558. Dr. Minirth's diagnoses included dysthymic disorder and persistent insomnia. *Id*. When Plaintiff saw Dr. Minirth on July 15, 2009, she reported increased stress and anxiety. *See* Tr. at 557. The diagnoses were dysthymic disorder, increased eating, increased blood pressure, GERD and persistent insomnia. *Id*. Plaintiff returned to Dr. Hughes on August 10, 2009. She reported she was continuing to see Dr. Minirth and was dealing with stress. *See* Tr. at 462. Dr. Hughes' impressions included HTN, hyperlipidemia, depression, insomnia, GERD, postmenopausal status and left breast mass. *See* Tr. at 465-6. At the next visit to Dr. Minirth on September 4, 2009, Plaintiff noted that she was tired during the day and the Celexa made her sleepy. *See* Tr. at 556. The diagnoses were

unchanged from the previous visit. *Id*. Plaintiff followed up with Dr. Minirth on September 29, 2009. *See* Tr. at 555.

On October 5, 2009, Plaintiff began treating with a new primary care physician, Dr. Melanie Lane Reed, M.D., of Family Medical Center at Baylor. She reported problems with an abnormal mammogram, high blood pressure, increased weight since her mother died 10 years ago and back pain. *See* Tr. at 506. Dr. Reed's impressions were an abnormal mammogram, back pain, hyperlipidemia, and HTN. *See* Tr. at 509-10.

On November 24, 2009, x-rays of the right knee were performed. The x-rays showed mild anterior and medial compartment joint space narrowing. *See* Tr. at 527. An MRI of the lumbar spine was also performed on the same day. The MRI revealed mild multilevel disc dessication and bulges throughout. *See* Tr. at 525. Plaintiff returned to Dr. Frank Minirth on December 13, 2009. She reported increased anxiety and decreased depression. *See* Tr. at 554.

On December 29, 2009, Plaintiff saw Dr. Henry Underwood, D.O. She complained of her right knee locking up and giving out on her. *See* Tr. at 520. Further, she noted lower back pain was radiating into the hips and legs with some associated burning, numbness and tingling sensations. *Id*. Also, Plaintiff reported having depression and anxiety. *Id*. The physical examination documented: her height was 5'5"; her weight was 196 pounds; her blood pressure was 102/70; her right knee had decreased range of motion, a positive McMurray sign, a positive Apley sign, subpatellar popping sounds, laxity and weakness with positive Drawer signs and decreased pinpricking in the peripheral nerves; and her lumbar spine had pinpoint tenderness from L1 down to the L5 spinous processes, tenderness over the sacroiliac joints, decreased range of motion in the lumbar spine and she could not lift her legs in the supine position. *See* Tr. at 522-3. Dr. Underwood's diagnoses were: pharyngitis; sinusitis; upper respiratory infection; bipolar depression, chronic; HTN; lumbar disc bulges at L1-L2, L2-L3, L4-L5 and L5-S1; lumbar radiculopathy; right knee internal derangement; and lipoma on the posterior right neck. *See* Tr. at 523.

An MRI of the right knee was performed on December 31, 2009 and it showed chondromalacia involving the medial and anterior compartments. *See* Tr. at 517.

Dr. Henry Underwood completed a Physical Residual Functional Capacity Questionnaire on March 9, 2010. Dr. Underwood listed the diagnoses as lumbar radiculopathy, lumbar disc bulge (L1-L2, L2-L3, L4-5 and L5-S1), lipoma right trapezius and right biceps, right knee chondromalacia patella and depression. *See* Tr. at 531. Dr. Underwood opined Plaintiff was limited to: standing 20 minutes continuously; standing and walking for about 2-hours total in an 8-hour working day; frequently lifting less than 10 pounds and occasionally lifting 10 pounds; reaching 75% of an 8-hour workday; handling 50% of an 8-hour workday; and fingering 60% of an 8-hour workday. *See* Tr. at 533-4. Additionally, he opined Plaintiff was incapable of even low stress jobs due to poor concentration, crying outbursts, poor self esteem and pain. *See* Tr. at 532. Also, Dr. Underwood opined Plaintiff would likely be absent from work about 4 times a month as a result of her impairments and treatment. *See* Tr. at 535.

Plaintiff returned to Dr. Frank Minirth on March 25, 2010 She stated she was not feeling well and had increased anger, depression and anxiety. *See* Tr. at 553. She also reported having suicidal thoughts. *Id*. The diagnoses were dysthymic disorder, increased eating, increased blood pressure, GERD and persistent insomnia. *Id*. Plaintiff saw Dr. Minirth 5 times from April through June of 2010 and reported some stabilization mentally. *See* Tr. at 548-52.

Plaintiff presented to Dr. Underwood on June 28, 2010. Her chief complaints were neck pain, back pain and knee pain. *See* Tr. at 587. Positive findings on the physical and neurological examinations included some decreased pinprick over the lower extremities, positive Tinel's signs, muscle tenderness in the L2-L5 spinous process and reduced range of motion in the lumbar spine. *See* Tr. at 588. Dr. Underwood's diagnoses were: thyroid goiter; lipoma of the neck on the right; cervical dysfunction; lumbar radiculopathy; multiple lumbar disk bulges from L1-S1 with desiccation; right knee chondromalacia patella and on the left as well clinically; HTN; hyperlipidemia; and sinusitis. *See* Tr. at 589.

When Plaintiff saw Dr. Frank Minirth on August 31, 2010, she said she experiencing a great amount of stress but was coping. *See* Tr. at 547. An MRI of the left knee was performed on October 5, 2010. It revealed moderate to severe chondromalacia in the anterior and medial compartments. *See* Tr. at 584. The following day, on October 6, 2010, Plaintiff saw Dr. Henry Underwood. Plaintiff complained of right knee pain, neck pain, back pain, wrist pain and hand pain. *See* Tr. at 581. She also reported depression, anxiety, irritability, worthlessness and crying spells. *Id*. He recommended she obtain services from a psychiatrist at Glen Oaks. *Id* The physical examination documented: positive Tinel's sign in the lower extremities; weakness in the right hand at 4/5; right knee tenderness with positive McMurray sign and Apley sign; subpatellar popping sounds on range of motion of both knees; tenderness from L2 down to the L5 spinous process; decreased range of motion in the lumbar spine; positive SLR in the lumbar spine; and weakness and positive Tinel's sign in the bilateral wrists. *See* Tr. at 582.

Dr. Underwood's diagnoses included: exacerbation state and depression secondary to her present illnesses; lipoma of the right neck; carpal tunnel syndrome; lumbar radiculopathy with multiple disk bulges from L1 through S1 and disk desiccation; and chondromalacia patella of the bilateral knees. *See* Tr. at 583.

Plaintiff had seven appointments with Dr. Minirth from October through December of 2010. *See* Tr. at 540- 6. On a scale of 1 to 10, her symptoms of depression, anxiety, insomnia, anger and low functioning routinely ranged from 7 to 9. *See* Tr. at 544 and 546. Dr. Underwood also included attention deficit hyperactivity disorder and bipolar disorder to her diagnoses. *Id*.

Plaintiff had a follow up appointment with Dr. Underwood on December 10, 2010. She reported continued lower back pain radiating down the hips and legs. *See* Tr. at 577. She also said her right and left knee were buckling on her and had a burning, numbness and tingling sensation in her wrists and hands. *Id*. The clinical examination showed: positive Tinel's sign at the volar surface of both wrists; weakness in the right hand at 4/5; right knee tenderness in the medial compartment; right and left knee

tenderness in the subpatellar compartment; lumbar tenderness from L1 down to L5 spinous processes; decreased range of motion in the lumbar spine; inability to hop or squat; difficulty on toe and heal walking; positive Lasegue's sign; and problems with Kemp's sign. *See* Tr. at 579. The diagnoses were: lumbar disk disease; lumbar disk bulge from L1-S1; carpal tunnel syndrome of the wrists; lipoma tumor of the right neck; cervical, dorsal and lumbar somatic dysfunction; chondromalacia patella of the right and left knees; left knee medial meniscus degeneration; right knee internal derangement clinically; bipolar disorder; and status post exacerbation of depression *Id*.

Plaintiff presented to the Child and Family Guidance Center on March 7, 2011 for an initial psychiatric evaluation. She reported a history of depression with an increase in depression since her husband died. *See* Tr. at 597. Further, she reported a history of audio and visual hallucinations in the past. *Id*. Plaintiff also reported a history of sexual abuse as a child. *See* Tr. at 598. The mental status examination was fairly unremarkable. *See* Tr. at 599-600. The axis I diagnoses contained bipolar disorder, depressed and severe with psychotic features, panic disorder with agoraphobia and post traumatic stress disorder. *See* Tr. at 600.

Plaintiff saw Dr. Henry Underwood again on March 9, 2011. She said she continued to have neck pain and back pain. *See* Tr. at 574. She also reported numbness and tenderness in her fingers and hands. *Id*. On the physical examination, there were: positive Tinel's sign in the wrists; decreased pinprick on the L5 dermatome in the lower extremities; decreased range of motion in the neck, dorsal and lumbar spine; positive SLR in the lumbar spine; patella popping and positive McMurray and Apley signs in the right knee; and reduced range of motion in the right knee. *See* Tr. at 575-6. Plaintiff returned to the Child and Family Guidance Center on April 11, 2011. She reported continuing grief, depression, decreased sleep, irritability, audio hallucinations, paranoia and panic attacks. *See* Tr. at 595. The axis I diagnoses were unchanged. *Id*. Her global assessment of functioning ("GAF") on axis V was assessed at 50. *Id*.

At her next appointment on May 9, 2011, she said the voices were less loud, she was still having crying spells and she was having death wishes. *See* Tr. at 594. Her axis I diagnoses were unchanged and her GAF was assessed as 50-55. *Id*.

Plaintiff saw Dr. Edward Panousieris, D.O. for a Social Security scheduled consultative examination on June 16, 2011. Dr. Panousieris noted that there were no medical records available for his review prior to the appointment. *See* Tr. at 601. She noted she was being followed by a psychiatrist for major depression and suicidal ideation. *Id*. Plaintiff said she had hearing loss with total deafness in the left ear. She said she had hearing aids but did not wear them as there was too much background noise. *Id*. Plaintiff reported a history of HTN, hyperlipidemia and hypothyroidism. *Id*.

With regard to her back, Plaintiff said she had pain shooting down the right lower extremity and had been diagnosed with sciatic nerve damage and three-level disc disease. *Id*. Plaintiff said she also had nerve damage in her arms and she experienced tingling and numbness. *See* Tr. at 602. Additionally, Plaintiff complained of knee pain with popping, pain and swelling. *Id*. The physical examination documented: her blood pressure was 100/70; her weight was 198 pounds; her height was 5'5"; she had modest hearing loss to roomlevel conversation; and range of motion of the lumbar spine elicited back pain. *See* Tr. at 603-4. X-rays of the right knee showed slightly diminished medial disc height with a superior patellar spur and lateral tibial spur. *See* Tr. at 604. X-rays of the lumbar spine documented markedly diminished L5-S1 disc height, L5-S1 foraminal opening and multilevel anterior spurring. *Id*. Dr. Panousieris' assessments were: history of major depression with suicidal ideation; complete hearing loss on the left after removal of an acoustic neuroma; 70% hearing loss on the right with scarred right tympanic membrane; HTN; hyperlipidemia; hypothyroidism; back pain with recurrent right sciatica; osteoarthritis of the right knee; and possible cervical radiculopathy versus cervical stenosis with claimed glove anesthesia of the arms. *Id*.

Plaintiff returned to the Child and Family Guidance Center on June 27, 2011. She said she was compliant with her medications but still had audio and visual hallucinations. *See* Tr. at 641. The axis I diagnoses were bipolar disorder, depressed and severe with psychotic features, panic disorder with agoraphobia and post traumatic stress disorder. *Id*. Her GAF was noted to be at 50- 55. Id .

On July 30, 2011, Plaintiff saw Dr. Ronald Anderson, Ph.D. for a Social Security scheduled psychological consultative examination. Her chief complaints were of depression, bipolar disorder, anxiety and attention deficit hyperactivity disorder. *See* Tr. at 607. The mental status examination revealed: she had perceptual abnormalities of hearing voices but they were not present during the exam; her mood was sad and depressed; her affect was flat and labile; her estimated intellectual functioning was in the low average range; her remote memory was a little poor; her immediate memory was poor as she could only repeat four digits forward and two digits backward; her concentration was fair; and her judgment and insight were fair. *See* Tr. at 609-10. Dr. Anderson's axis I diagnoses were: major depressive disorder, single episode and unspecified; dysthymic disorder; anxiety disorder, not otherwise specified; bipolar II disorder; and attention deficit hyperactivity disorder. *See* Tr. at 611. The current GAF was assessed at 45-50. *Id*.

On August 10, 2011, Plaintiff was seen at the Child and Family Guidance Center. She said she was sleeping better and was feeling less depressed. *See* Tr. at 640. The axis I was unchanged from her prior visits and her GAF was 55. *Id*.

**B.**     **The ALJ Properly Determined that Plaintiff Could Perform Other Work With Little, If Any, Vocational Adjustment.**

The ALJ found that, although Plaintiff could not perform her PRW, she could perform other work that existed in significant numbers in the national economy. *See* Tr. at 33-35. Because Plaintiff was 58 years old ("of advanced age" under the Act's regulations) at the time of the ALJ's decision, had the RFC to perform sedentary work, and had skilled and semi-skilled PRW, before the ALJ could find that Plaintiff could perform other work, he had to first determine that Plaintiff either acquired skills

14

from her past work that were transferrable to skilled or semi-skilled sedentary work, or recently completed education that provided for direct entry into skilled sedentary work. *See* Tr. at 27, 33-34; *see also* 20 C.F.R. §§ 404.1563, 404.1568(d)(4); 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rules 201.07, 201.15; Social Security Ruling (SSR) 82-41, 1982 WL 31389 at *1.

Here, the ALJ found, based on the VE's testimony, that Plaintiff could perform other work, such as a billing clerk and data entry clerk, given her age, education, work history and RFC, because she acquired transferrable skills from her prior work as an office manager and receptionist. *See* Tr. at 34-35, 61-62. "The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *See Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995). Thus, the ALJ properly deferred to the VE's expertise in determining whether Plaintiff had skills that were transferrable to the jobs the VE identified. Contrary to Plaintiff's contention, the ALJ complied with SSR 82-41's requirement that he identify Plaintiff's acquired work skills, specify the jobs to which the acquired work skills were transferable, and include evidence that the jobs exist in significant numbers in the national economy. *See* Tr. at 34-35. *See* SSR 82-41, 1982 WL 31389, at *7; Pl. Br. at 15-16. Therefore, no error occurred at step five.

Plaintiff also argues that the ALJ erred because, in finding that she had transferrable skills, the ALJ did not properly analyze whether Plaintiff would need to make any vocational adjustments in terms of "tools, work processes, work settings, or the industry," as the regulations require. *See* 20 C.F.R. § 404.1568(d)(4); 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(f) (stating: "In order to find transferability of skills to skilled sedentary work for individuals who are of advanced age (55 and over), there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings or the industry"); SSR 82-41, 1982 WL 31389, at *5; Pl. Br. at 12-17. In finding that Plaintiff could perform other work, the ALJ considered whether Plaintiff would have to make any vocational adjustment to perform the billing clerk and data entry clerk jobs that the VE identified. *See* Tr. at 35, 61-63. *See* Pl. Br. at 13.

Specifically, the VE testified that Plaintiff would need no vocational adjustment in terms of the tools used, and that Plaintiff "could" have to make an adjustment in terms of the industry if she chose to work in a different industry than her prior jobs, but that she did not have to work in a different industry. *See* Tr. at 35, 62-63. The VE also testified that the billing clerk and data entry clerk jobs required the same or a lesser degree of skill than Plaintiff's PRW required. *See* Tr. at 34-35, 59, 61. The ALJ did not err in determining that, based on the totality of the VE's testimony, there was very little, if any, vocational adjustment that Plaintiff needed to make at age 55. *See* Tr. at 35.

The ALJ complied with SSR 82-41, which states that: "where job skills have universal applicability across industry lines, e.g., clerical, professional, administrative, or managerial types of jobs, transferability of skills to industries differing from past work experience can usually be accomplished with very little, if any, vocational adjustment where jobs with similar skills can be identified as being within an individual's RFC." SSR 82-41, 1982 WL 31389, at *5. As such, the ALJ correctly found at Step Five that Plaintiff had transferrable skills that would allow her to perform skilled or semi-skilled sedentary work. *See* Tr. at 35; *see* also 20 C.F.R. § 404.1568(d)(4); 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(f); SSR 82-41, 1982 WL 31389, at *5. Therefore, no error occurred.

Plaintiff argues that the VE only testified about tools and industry and did not testify about the other two areas of adjustment listed in the regulations (work processes and work settings). Plaintiff's counsel led the VE questioning regarding vocational adjustment, and could have asked the VE about work processes and work settings, but did not do so. *See* Tr. at 62-63; *see* 20 C.F.R. § 404.1568(d)(4); Pl. Br. at 14-15. Plaintiff does not demonstrate that she "could and would have adduced evidence [regarding work processes and settings] that might have altered the result" in this case. *See Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000); Pl. Br. at 14-15. Although Plaintiff asserts that "surely, there are different work tools and work processes used in encoding numbers into a computer", this statement does not refute the VE's that Plaintiff's skills were transferrable to the jobs identified. *See* Tr. at 61-62. *See* Pl. Br. at 16. Therefore, Plaintiff has not shown prejudice, and, thus, no grounds exist to remand

this case. *Id.*; *see* also *Jones v. Astrue*, 691 F.3d 730, 734-35 (5th Cir. 2012) ("[t]he party seeking to overturn the Commissioner's decision has the burden to show that prejudice resulted from an error.").

In addition, while the ALJ did not specifically ask the VE about vocational adjustment, any error was harmless because the ALJ's opinion demonstrates that he applied the correct legal standard to determine whether Plaintiff could perform other work. *See* Tr. at 33-35; *see* also *Sergent v. Astrue*, No. 10cv01041, 2011 WL 3299051, *8 -*12 (S.D. Tex. Aug. 1, 2011). In *Sergent*, the court affirmed the ALJ's Step Five finding that the plaintiff, who, like Plaintiff in this case, was of advanced age, could perform other work, despite the fact that the ALJ did not specifically ask the VE whether the plaintiff's skills were "transferrable with little or no vocational training or job orientation." *Id.* The court recognized that "a case will not be remanded in this circuit simply for the reason that the ALJ did not use 'magic words.' Rather, the [Fifth Circuit] will only remand a case if there is no indication that the ALJ applied the correct legal standard." *Id.* at *10; *see* also *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir.1986). The court further stated that the ALJ's written opinion provided "the most convincing evidence that the ALJ had satisfied his burden and applied the correct legal standard" because his opinion stated: "considering [Plaintiff's] age, education, and transferable work skills, a finding of 'not disabled' is appropriate . . . " and referenced Section 202.00(f) of the Medical-Vocational Guidelines. *Id.* at *12.

In this case, the ALJ's opinion states that he considered Plaintiff's "age, education and transferable work skills" and references application of Medical-Vocational Rules 201.07 and 201.15. *See* Tr. at 35. Therefore, the ALJ applied the correct legal standard and satisfied his burden at Step Five of demonstrating that Plaintiff could perform other work that exists in significant numbers in the national economy.

Plaintiff also argues that the jobs identified by the VE, billing clerk and data entry clerk, are not "closely related" to Plaintiff's PRW as an office manager and receptionist, as SSR 82-41 requires, and that "the only degree of similarity . . . is that all 4 jobs may require the use of a computer." *See* SSR

82-41, 1982 WL 31389, at *5; Pl. Br. at 15. The VE testified that the skills of being able to time and use the computer, work with numbers, and work around different people, were all transferrable to the jobs he identified. *See* Tr. at 34, 61-62. The VE is the expert on the specific requirements of occupations. *See Vaughan*, 58 F.3d at 132. Further, the ALJ did not err by finding that the jobs of billing clerk and data entry clerk involved working with data rather than people, as the ALJ's finding is consistent with the definitions of those jobs found in the *Dictionary of Occupational Titles*. *See* Pl. Br. at 16.

The DOT describes the billing clerk job, DOT# 214.362-042, as: Operates calculator and typewriter to compile and prepare customer charges, such as labor and material costs: Reads computer printout to ascertain monthly costs, schedule of work completed, and type of work performed for customer, such as plumbing, sheet metal, and insulation. Computes costs and percentage of work completed, using calculator. Compiles data for billing personnel. Types invoices indicating total items for project and cost amounts. *See* U.S. Dep't of Labor, *Dictionary of Occupational Titles* (4th ed. 1991) (DOT), # 214.362-042.

The DOT describes the data entry clerk job, DOT# 203.582-054, as: Operates keyboard or other data entry device to enter data into computer or onto magnetic tape or disk for subsequent entry: Enters alphabetic, numeric, or symbolic data from source documents into computer, using data entry device, such as keyboard or optical scanner, and following format displayed on screen. Compares data entered with source documents, or re-enters data in verification format on screen to detect errors. Deletes incorrectly entered data, and re-enters correct data. May compile, sort, and verify accuracy of data to be entered. May keep record of work completed. *See* DOT# 203.582-054.

As Plaintiff acknowledges, the VE testified that Plaintiff acquired the skill of working "around" people in her prior work. *See* Tr. at 61; *see* Pl. Br. at 16. The VE did not testify that the billing clerk and data entry jobs required working with people. *See* Tr. at 61-62. Therefore, the ALJ's finding is not inconsistent with the VE's testimony, as Plaintiff contends. *See* Tr. at 34-35, 61-62; *see* also Pl. Br. at

16. Thus, no error occurred. Moreover, Plaintiff's argument that the ALJ's transferrable skills finding is "baseless" fails because, contrary to Plaintiff's assertion, the VE testified that Plaintiff acquired skills from "all" of her past jobs, not just her prior billing clerk job. *See* Tr. at 62; *see* also Pl. Br. at 16. In sum, Plaintiff fails to show that the ALJ erred at Step Five, and, accordingly, fails to meet her burden to show prejudice. *See Jones*, 691 F.3d at 734-35.

**C.    The ALJ Properly Relied on the VE's Testimony That Plaintiff Could Perform the Jobs of Billing Clerk and Data Entry Clerk.**

The VE in this case was well qualified to opine that Plaintiff could perform the jobs of billing clerk and data entry clerk, notwithstanding the ALJ's RFC finding. *See* Tr. at 27, 61, 156-57. *See Vaughan*, 58 F.3d at 132. The ALJ properly relied on the VE's knowledge of the job requirements. *See Carey,* 230 F.3d at 146; *Laurent v. Astrue*, 366 F. App'x 559, 561 (5th Cir. 2010) (unpublished). Plaintiff argues that because the ALJ's RFC finding indicates that she could not "understand, remember, and carry out *complex* instructions," she could not perform jobs requiring a reasoning development level of 3 (data entry clerk) or 4 (billing clerk). *See* Pl. Br. at 17-18. It is important to note that the DOT does not state that reasoning development level 3 or 4 requires the ability to understand, remember, and carry out "complex" instructions. *See* DOT, Appendix C, at 1011 (defining the reasoning development levels).[1] Therefore, no apparent conflict exists between the DOT and the VE's testimony in this case. In *Carey*, *supra*, the Fifth Circuit rejected the plaintiff's allegation of an actual or implied conflict between the VE's testimony and the DOT when the VE, like the VE in this case,

---

[1]A reasoning level 3 occupation requires a claimant to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "[d]eal with problems involving several concrete variables in or from standardized situations." *See* DOT, Appendix C, 1991 WL 688702. A reasoning level 4 occupation requires a claimant to "[a]pply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists" and [i]nterpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form." *Id. "*Examples of rational systems are: bookkeeping, internal combustion engines, electric wiring systems, house building, farm management, and navigation." *Id.*

specifically and unequivocally testified that Plaintiff could perform the jobs identified, notwithstanding Plaintiff's limitations. *See* 230 F.3d at 145-47. The *Carey* court stated:

> Carey's counsel was given an opportunity to object or cross-examine the vocational expert on the affect of Carey's amputation on his ability to perform the identified jobs. Nonetheless, Carey's counsel did not raise the issue or challenge the vocational expert's testimony . . . in the administrative hearing. Given the tangential nature of the conflict alleged here, we surmise that Carey's argument actually reduces to a factual disagreement about whether a person with one arm can perform a job requiring some degree of manual dexterity and fingering. The regulatory structure as well as the controlling precedent requires expert testimony on such issues, and there is no indication in this record that the vocational expert's testimony that Carey could perform those jobs with one arm and hand was incorrect. Our task in these cases is merely to determine whether the Commissioner's determination is supported by substantial evidence. We are not permitted to "reweigh the evidence in the record, try the issues de novo, or substitute" our own judgment for that of the Commissioner, or even the testifying witnesses. *Id*. at 146 (internal citations omitted).

Similarly, in this case, the VE specifically testified that Plaintiff could perform the jobs of billing clerk and data entry clerk with her limitations, and Plaintiff's counsel did not object or cross examine the VE with respect to that testimony. *See* Tr. at 61-63. Therefore, there is no indication in the record that the VE's testimony was incorrect and the ALJ, thus, properly relied on the VE's testimony.

In addition, in *Laurent,* the Fifth Circuit found that the plaintiff failed to show that the ALJ improperly relied on the VE's opinion that a person limited to sedentary work who must alternate between sitting and standing could perform the job of a bench assembler, because there was no indication that the VE's testimony was unreliable and the plaintiff pointed to no evidence, other than the DOT, that the VE's testimony was incorrect. *See Laurent*, 366 F. App'x at 561. Plaintiff in this case, like the Plaintiff in *Laurent*, cites to no evidence, other than the DOT, to support her argument that the VE incorrectly testified that she could perform the jobs of billing clerk and data entry clerk with her RFC. *See* Pl. Br. at 17-18.

Further, Plaintiff incorrectly asserts that the ALJ did not inquire on the record as to whether the VE's testimony was consistent with the DOT. *See* Pl. Br. at 18. The ALJ specifically asked the VE

whether there was any conflict between the VE's testimony in this case and the information in the DOT, and the VE testified that there was no conflict. *See* Tr. at 62. Therefore, no error occurred.

The ALJ applied the correct legal standard at Step Five and properly determined that there was other work in the national economy that Plaintiff could perform. As such, the ALJ correctly concluded that Plaintiff was not disabled under the Act.

**D.    The ALJ Fully Complied with the Appeals Council's Remand Order**

Plaintiff contends that the ALJ failed to comply with the Appeals Council's remand order. *See* Pl. Br. at 19-20. Specifically, Plaintiff argues that the ALJ did not obtain and consider additional evidence related to Plaintiff's knee impairment and mental impairments, as the Appeals Council ordered, because the most recent medical evidence in the record is dated August 2011 and the Appeals Council's remand order is dated February 2012. *See* Pl. Br. at 19-20. Plaintiff's argument, however, overlooks the fact that the prior ALJ decision is dated July 23, 2010, and, thus, any medical evidence submitted after that date, albeit prior to the remand order, is new evidence as the ALJ had not previously considered it. *See* Tr. at 12, 106-08.

Further, as the ALJ noted, he specifically considered additional and updated evidence "obtained with the assistance of counsel," which is in the record as Exhibits 19F through 24F and 28F, including consultative examinations performed on June 16, 2011 and July 30, 2011. *See* Tr. at 12, 21-24. While no medical expert testified at the ALJ hearing on remand, the Appeals Council's remand order, and the Act's regulations, provides the ALJ with the discretion to determine that medical expert testimony was not necessary because the record contained substantial medical evidence regarding Plaintiff's alleged knee impairment and mental impairments. *See* Tr. at 12, 21-24, 107; *see* also 20 C.F.R. § 404.1519. Therefore, the argument that the ALJ did not comply with the Appeals Council's order on remand fails.

Further, it is important to note that, on remand, the ALJ considered the additional evidence related to Plaintiff's knee impairment and mental impairments and fashioned an RFC that accounted for limitations caused by those impairments. *See* Tr. at 21-27. *See* Pl. Br. at 20. The ALJ's hypothetical

question to the VE at Step Five was proper because the question incorporated the ALJ's RFC finding, which substantial evidence in the record supported. *See* Tr. at 60; *see also White v. Astrue*, 240 F. App'x 632, 634 (5th Cir. 2007). Therefore, no error occurred.

**E.    The ALJ Properly Evaluated the Severity of All of Plaintiff's Medically Determinable Impairments.**

The ALJ correctly found that Plaintiff's "severe" impairments included Plaintiff's degenerative disc disease of the lumbar spine with back pain, obesity, total deafness in one ear, major depressive disorder, and anxiety disorder. *See* Tr. at 16. Plaintiff argues that the ALJ should have found that her carpal tunnel syndrome, diagnosed in October 2010, was a severe impairment. *See* Pl. Br. at 20-23. Plaintiff fails, however, to meet her burden of proving that her carpal tunnel syndrome was severe during the adjudicated time period of January 7, 2008 through September 12, 2012. *See* 20 C.F.R. § 404.1520(a)(4)(ii) and (c); *Perez v. Barnard*, 415 F.3d 457, 461 (5th Cir. 2005).

In *Stone v. Heckler,* 752 F.2d 1099, 1101 (5th Cir. 1985)*,* the Fifth Circuit interpreted the term "severe" found in 20 C.F.R. § 404.1520(c) and set forth the following legal standard applicable at step two of the sequential evaluation process:

> An impairment can be considered as not severe only if it is a slight abnormality having such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.

*See* also *Liza v. Apfel*, 219 F.3d 378, 390-91 (5th Cir. 2000) (reaffirming this standard following federal regulatory revisions).

In this case, contrary to Plaintiff's contention, the ALJ considered the evidence of Plaintiff's carpal tunnel syndrome diagnosis and Plaintiff's reported related symptoms. *See* Tr. at 21-22; *see also* Pl. Br. at 21. The evidence does not establish that Plaintiff's carpal tunnel syndrome was severe. Specifically, although Henry L. Underwood, III, DO diagnosed Plaintiff with carpal tunnel syndrome in October 2010, at his December 10, 2010 examination, Dr. Underwood noted that Plaintiff had full

range of motion in her upper extremities, only mild weakness (4 out of 5) in her right hand, and full strength in her left hand. *See* Tr. at 21, 577-83. On March 9, 2011, Plaintiff reported to Dr. Underwood that, although she had some numbness and tenderness in her fingers and hands, she was not dropping items. *See* Tr. at 22, 574. Dr. Underwood specifically noted that Plaintiff had full motor strength in her upper extremities with good handgrip strength. *See* Tr. at 22, 575. Therefore, the medical evidence does not support a finding that Plaintiff's carpal tunnel syndrome was severe. In addition, the ALJ did not err by not incorporating fingering and handling limitations in his RFC finding, as Plaintiff contends, because the above medical evidence does not establish any such limitations. *See* Pl. Br. at 22-23.

Moreover, the ALJ's failure to find that Plaintiff had severe carpal tunnel syndrome does not warrant remand because the ALJ did not end his analysis at Step Two. *See* Tr. at 11-36; *see Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987) (finding that the ALJ's failure to find an additional severe impairment at Step Two did not constitute grounds for remand because the case did not turn on the non-severity of that impairment). The ALJ considered the functional limitations that all of Plaintiff's impairments caused in fashioning his RFC finding and in proceeding to Step Five to find Plaintiff was not disabled under the Act. *See* Tr. at 11-36. Because the record does not support any fingering or handling limitations, the ALJ properly found, based on the VE's testimony, that Plaintiff could perform the jobs of billing clerk and data entry clerk. *See* Pl. Br. at 22-23. Thus, no error occurred.

The Fifth Circuit has noted that it is the task of the ALJ to resolve conflicts in the evidence. *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987). To the extent that Plaintiff is asking the Court to reweigh the evidence in her favor, the Court will refrain from doing so. *See Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)(In applying the substantial evidence standard, the Court must carefully examine the entire record but must refrain from reweighing the evidence or substituting its judgment for that of the Commissioner). "The Commissioner's decision is granted great deference and will not be disturbed unless the reviewing court cannot find substantial evidence in the record to support the Commissioner's decision or finds that the Commissioner made an error of law." *Leggett*, 67 F.3d at

564. Substantial evidence and relevant legal precedent support the ALJ's decision. Therefore, the opinion of the ALJ should be affirmed.

## V.  CONCLUSION

Substantial evidence supports the ALJ's ultimate conclusion that Plaintiff was not disabled. Therefore, the Commissioner's finding of "not disabled" should be affirmed. *See Morris*, 864 F.2d at 335; *Brock v. Chater*, 84 F.3d 726, 729 (5th Cir. 1996) ("[The Court] will not reverse the decision of an ALJ where the claimant makes no showing that he was prejudiced in any way by the deficiencies he alleges.").

It is accordingly

**ORDERED** that the decision of the Commissioner is hereby **AFFIRMED** and this social security action is **DISMISSED WITH PREJUDICE**.


So ORDERED and SIGNED this 30th day of September, 2014.


K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE